# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

---

**GLADYS SHERROD**
         **Plaintiff,**

    **v.**                                 **Case No. 10-C-0451**

**MICHAEL J. ASTRUE,**
**Commissioner of the Social Security Administration**
         **Defendant.**

---

## DECISION AND ORDER

Plaintiff Gladys Sherrod seeks judicial review of the denial of her application for supplemental security income ("SSI") benefits. Plaintiff alleged inability to work due to mental retardation, depression, migraine headaches, and allergies (Tr. at 132, 166-73, 187), but the Social Security Administration ("SSA") denied the application initially (Tr. at 68, 70) and on reconsideration (Tr. at 69, 76). Plaintiff requested a hearing before an Administrative Law Judge ("ALJ") (Tr. at 81), but the ALJ also found plaintiff not disabled (Tr. at 14-21, 28-35). Plaintiff then requested review by the Appeals Council, but the Council declined her request (Tr. at 1-3), making the ALJ's decision the SSA's final determination on the application. See Jones v. Astrue, 623 F.3d 1155, 1160 (7th Cir. 2010).

In this court, plaintiff argues that the ALJ should have found her presumptively disabled based on mental retardation. The record contains reports from two psychologists: one found her mentally retarded, the other did not, and the ALJ adopted the latter opinion. Because the ALJ committed no error of law, and because the scope of judicial review of an ALJ's factual determinations is limited, I affirm.

# I.  APPLICABLE LEGAL STANDARDS

## A.  Judicial Review

I review the ALJ's legal conclusions de novo but affirm her factual determinations if they are supported by "substantial evidence." Jones, 623 F.3d at 1160.  Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. E.g., Castile v. Astrue, 617 F.3d 923, 926 (7th Cir. 2010); Terry v. Astrue, 580 F.3d 471, 475 (7th Cir. 2009); see also Skinner v. Astrue, 478 F.3d 836, 841 (7th Cir. 2007) ("Substantial evidence must be more than a scintilla but may be less than a preponderance."). Under this deferential standard, if reasonable people could differ as to whether the claimant is disabled, the ALJ's decision to deny the claim must he upheld.  Elder v. Astrue, 529 F.3d 408, 413 (7th Cir. 2008).  Thus, while I must review the entire record, including both the evidence that supports as well as the evidence that detracts from the ALJ's conclusions, see, e.g., Young v. Sec'y of Health and Human Services, 957 F.2d 386, 388-89 (7th Cir.1992), I may not re-weigh the evidence, make independent credibility determinations, or substitute my judgment for that of the ALJ.  E.g., Elder, 529 F.3d at 413; Haynes v. Barnhart, 416 F.3d 621, 626 (7th Cir. 2005).  Further, while the ALJ must build a logical bridge from the evidence to her conclusion, she need not provide a complete written evaluation of every piece of testimony and evidence, Haynes, 416 F.3d at 626, and I must give her decision a commonsense reading rather than nitpicking for inconsistencies or contradictions, Jones, 623 F.3d at 1160.

## B.  Disability Standard

The ALJ determines whether a claimant is disabled for purposes of SSI under a sequential five-step test.  See 20 C.F.R. § 416.920(a)(4); see also Simila v. Astrue, 573 F.3d

503, 512-13 (7th Cir. 2009). Under this test, the ALJ first asks whether the claimant is working, i.e., engaged in "substantial gainful activity" ("SGA"). "Substantial gainful activity" is work activity that involves doing significant physical or mental activities, for pay or profit. 20 C.F.R. § 404.1572.

If the claimant is not working, the ALJ determines at step two whether the claimant has a "severe" impairment. An impairment is "severe" if it significantly limits the claimant's "physical or mental ability to do basic work activities." 20 C.F.R. §§ 404.1520(c) & 1521(a).

If the claimant has a severe impairment, the ALJ determines at step three whether the impairment meets or equals one of the impairments considered presumptively disabling under SSA regulations. These presumptively disabling impairments are compiled in 20 C.F.R. Pt. 404, Subpt. P, App. 1 (i.e., "the Listings"). In order to meet a Listing, the claimant must present evidence showing that she satisfies each of its "criteria." See Maggard v. Apfel, 167 F.3d 376, 379-80 (7th Cir. 1999). For instance, Listing 12.05, pertaining to mental retardation, provides:

> 12.05 Mental retardation: Mental retardation refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22.
>
> The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied.
>
> A. Mental incapacity evidenced by dependence upon others for personal needs (e.g., toileting, eating, dressing, or bathing) and inability to follow directions, such that the use of standardized measures of intellectual functioning is precluded;
>
> Or
>
> B. A valid verbal, performance, or full scale IQ of 59 or less;
>
> Or
>
> C. A valid verbal, performance, or full scale IQ of 60 through 70 and a physical

or other mental impairment imposing an additional and significant work-related limitation of function;

Or

D. A valid verbal, performance, or full scale IQ of 60 through 70, resulting in at least two of the following:
1. Marked restriction of activities of daily living; or
2. Marked difficulties in maintaining social functioning; or
3. Marked difficulties in maintaining concentration, persistence, or pace; or
4. Repeated episodes of decompensation, each of extended duration.

20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.05. In order to meet this Listing, the claimant's impairment must first meet the diagnostic description in the introductory paragraph and must then satisfy one of the four sets of criteria listed in sections A, B, C, and D. See Bixler v. Astrue, No. 2:09-cv-344, 2010 WL 2773097, at *3-4 (S.D. Ind. July 12, 2010); see also Novy v. Astrue, 497 F.3d 708, 709-10 (7th Cir. 2007); Mendez v. Barnhart, 439 F.3d 360, 362 (7th Cir. 2006).[1]

If the claimant's impairment does not meet a Listing, the ALJ must at step four determine whether the claimant can, given her residual functional capacity ("RFC"), perform any past relevant work. "RFC" is an assessment of the claimant's ability to perform sustained

---

[1]Other mental impairment Listings generally consist of three sets of "criteria" – the paragraph A criteria (a set of medical findings that substantiate the presence of a particular mental disorder), paragraph B criteria (a set of impairment-related functional limitations), and paragraph C criteria (additional functional criteria applicable to certain Listings). See Windus v. Barnhart, 345 F. Supp. 2d 928, 931 (E.D. Wis. 2004). The B criteria have four components: (1) activities of daily living ("ADLs"); (2) social functioning; (3) concentration, persistence, and pace; and (4) episodes of decompensation. 20 C.F.R. § 404.1520a(c)(3). The ALJ rates the degree of limitation in the first three areas using a five-point scale: none, mild, moderate, marked, and extreme, and the degree of limitation in the fourth (episodes of decompensation) using a four-point scale: none, one or two, three, and four or more. The last point on each scale represents a degree of limitation that is incompatible with the ability to work. 20 C.F.R. § 404.1520a(c)(4). Certain Listings, including that applicable to affective disorders such a depression, may be met if the claimant has marked limitations in two of these areas. 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.04(B).

work-related physical and mental activities in light of her impairments. SSR 96-8p.  In setting RFC, the ALJ considers both the "exertional" and "non-exertional" capacities of the claimant. Exertional capacity, which refers to the individual's strength-related abilities, is typically classified in the categories of sedentary, light, medium, heavy, and very heavy work. Non-exertional capacity includes all work-related functions that do not depend on physical strength: postural (e.g., stooping, climbing), manipulative (e.g., reaching, handling), visual (seeing), communicative (hearing, speaking), and mental (e.g., the ability to understand, carry out and remember instructions, and to respond appropriately to supervision, coworkers and customary work pressures in a work setting) activities.  See, e.g., Neave v. Astrue, 507 F. Supp. 2d 948, 959 (E.D. Wis. 2007); Patterson v. Barnhart, 428 F. Supp. 2d 869, 885-86 (E.D. Wis. 2006); Blom v. Barnhart, 363 F. Supp. 2d 1041, 1057 (E.D. Wis. 2005); Wates v. Barnhart, 274 F. Supp. 2d 1024, 1036-37 (E.D. Wis. 2003).

Finally, if the claimant lacks the RFC to perform her past work (or if she lacks a relevant work history), the ALJ must at step five determine whether the claimant is capable of performing other jobs that exist in significant numbers in the national economy.  The claimant bears the burden of presenting evidence at steps one through four, but if she reaches step five the burden shifts to the SSA to show that the claimant can make the adjustment to other work. See, e.g., Briscoe v. Barnhart, 425 F.3d 345, 352 (7th Cir. 2005).  The SSA may carry this burden either by relying on the testimony of a vocational expert ("VE"), who evaluates the claimant's ability to work in light of her limitations, or through the use of the "Medical-Vocational Guidelines" (a.k.a. "the Grid"), 20 C.F.R. Pt. 404, Subpt. P, App. 2, a chart that classifies a person as disabled or not disabled based on her exertional ability, age, education, and work experience.  However, the ALJ may not rely on the Grid and must consult a VE if non-exertional

limitations (e.g., mental impairments) substantially reduce her range of work. Neave, 507 F. Supp. 2d at 953.

## II. FACTS AND BACKGROUND

### A. Medical/Vocational Evidence[2]

On October 19, 2005, plaintiff underwent a vocational evaluation with Roger Paul, MS, CRC, LPC, on referral from her financial employment planning caseworker. (Tr. at 159.) Plaintiff noted that she used to receive SSI for one of her sons but those benefits ended when he was incarcerated. She stated, "It's getting cold. I'll need more money." (Tr. at 160.)

Paul noted that plaintiff had a significant cognitive disability, and that her ability to respond to queries and provide information was very limited. (Tr. at 160.)[3] He further noted that plaintiff was functionally illiterate; her daughter helped her read the mail and accompanied her when she paid bills. (Tr. at 160.) Plaintiff attended school through the tenth grade, when she dropped out after becoming pregnant, and took special education classes. Plaintiff related no significant employment history, last working on an assembly line packing bottles for one month eleven years ago. (Tr. at 161.)

Paul conducted several tests, which revealed that plaintiff read at a second grade level, spelled at a first grade level, and performed arithmetic at a fourth grade level. According to the

---

[2]Since plaintiff's physical condition is not at issue in this action, I do not discuss the medical records pertaining thereto in this decision. (Tr. at 218-39, 246-57, 308-11.) The SSA arranged for a consultant, Dr. Dar Muceno, to review plaintiff's records and prepare a physical RFC report. Dr. Muceno found no exertional or other physical limitations, aside from avoidance of hazards (machinery, heights, etc.). (Tr. at 258-65.) Plaintiff does not contest these findings or the ALJ's conclusions regarding her physical abilities.

[3]Under the "medical" section of the report, Paul listed allergies, migraine headaches, and weight loss. Under the "mental health" section, he listed depression and stress. (Tr. at 160.)

BETA II test, her IQ of 61 placed her in the mentally deficient range, below the 1st percentile. However, Paul noted that this test should not be used to determine eligibility for entitlement programs; for such applications, the Wechsler Adult Intelligence Scale ("WAIS") or similar instrument, administered by a licensed psychologist, including an evaluation of adaptive behavior, should be used. (Tr. at 162.)

Based on her lack of previous employment, Paul found that plaintiff had no transferrable work skills. As vocational assets, he listed her pleasant demeanor, willingness to participate in job training, ability to follow simple oral instructions, and support from her children in activities of daily living such as reading and paying bills. As vocational limitations, he listed her cognitive impairment; functional illiteracy; and lack of education, a driver's license, and work experience/skills. (Tr. at 163.)

Paul concluded that plaintiff's intellectual functioning appeared at or near the level of mild mental retardation, although that had to be corroborated through high school records and/or psychological testing. (Tr. at 163.) Given her limitations, he found that most of the programming available through state welfare agencies would be unhelpful; the types of programs and services available through the state Division of Vocational Rehabilitation ("DVR") seemed more appropriate. Paul opined that plaintiff would be unable to comprehend the written materials used in a GED preparation class and suggested that any attempts to further her education be more functionally oriented and designed to allow her to engage in simple personal finance and budgeting, shopping, and money handling. Given her multiple barriers to employment, he suggested that she be referred for SSI advocacy. He concluded that plaintiff was, in his opinion, incapable of obtaining and maintaining competitive employment. (Tr. at 164-65.)

On March 21, 2006, plaintiff underwent a consultative psychological evaluation with Joan Nuttal, Ph.D.  Dr. Nuttal noted that plaintiff needed no help or reminders with personal care, fixed meals daily, used public transportation, shopped in stores, got along with others, and had no problems with household chores.  However, her daughter helped her with reading and paying bills.  Plaintiff reported trouble following written instructions but could follow non-complex spoken directives.  (Tr. at 240, 242.)  Dr. Nuttal noted that plaintiff expressed herself well, made good eye contact, and had no difficulty tolerating the length or pace of the appointment.  (Tr. at 241.)  She socialized with neighbors and some relatives.  Plaintiff noted some appetite loss and feelings of hopelessness related to her depression, but she reported no suicidal feelings and the ability to relax more on Zoloft.  (Tr. at 241.)  Dr. Nuttal further noted that plaintiff described no anhedonia,[4] played board games, enjoyed soap operas, and went to the park.  (Tr. at 242.)

Dr. Nuttal stated that plaintiff was oriented and knew the name of the current president and two other recent presidents (although not in the correct order).  She could name two bordering states but made only broad and vague statements about current events.  She was able to spell the word "world" forwards and backwards, and could follow a three-step command and do high levels of proverb interpretation.  However, when asked what she would do if she smelled smoke in a crowded theater, plaintiff said "yell."  (Tr. at 241.)

Dr. Nuttal administered the WAIS III test, which reflected a verbal IQ of 69, performance IQ of 74, and full scale IQ of 69.  However, Dr. Nuttal opined that although some of plaintiff's

---

[4]"Anhedonia" is an absence of pleasure.  Stedman's Medical Dictionary 88 (27th ed. 2000).

scores fell in the range of mild mental retardation,[5] she did not believe that plaintiff met "the criteria for mental retardation because she does not need an inordinate amount of help on a daily basis in order to take care of herself and take care of basic tasks.  She seems to be much too independent in the activities of daily living."  (Tr. at 242.)  Dr. Nuttal concluded: "This examiner is not going to list mental retardation because she is quite independent in the activities of daily living.  It appears true that she has difficulty with reading, but that is not enough to qualify her as retarded. . . . This claimant would appear to be employable.  She also appears able to manage her own funds."  (Tr. at 242-43.)[6]

On July 28, 2006, Keith Bauer, Ph.D., prepared a psychiatric review technique form for the SSA, evaluating plaintiff under Listing 12.04, affective disorders, and 12.05, mental retardation.  (Tr. at 270.)  Under 12.04, Dr. Bauer found mild to moderate limitations under the B criteria, thus concluding that she did not meet that Listing.  (Tr. at 280.)  Under 12.05, he found that while plaintiff was functionally illiterate, she did not satisfy the criteria of that Listing

---

[5]In cases where more than one IQ score is derived from the test administered, e.g., where verbal, performance, and full scale IQs are provided in the Wechsler series, the SSA uses the lowest score in conjunction with Listing 12.05.  See 20 C.F.R., pt. 404, subpt. P, App. 1, § 12.00D(6)(c).

[6]Dr. Nuttal also diagnosed plaintiff with dysthymia, finding the pervasiveness and severity of her symptoms insufficient to justify a diagnosis of major depression.  She set a GAF of 56.  "GAF" – the acronym for "Global Assessment of Functioning" – is a rating of the person's psychological, social, and occupational functioning.  Set up on a 0-100 scale, scores of 91-100 are indicative of a person with no symptoms, while a score of 1-10 reflects a person who presents a persistent danger of hurting herself or others.  Scores of 81-90 reflect "absent or minimal" symptoms, 71-80 "transient" symptoms, 61-70 "mild" symptoms, 51-60 "moderate" symptoms, and 41-50 "severe" symptoms.  Diagnostic and Statistical Manual of Mental Disorders ("DSM-IV") 32-34 (4th ed. 2000).

either.  (Tr. at 274.)[7]  In an accompanying mental RFC report, Dr. Bauer found moderate limitations in eight areas, no significant limitations in twelve.  (Tr. at 266-67.)

A July 31, 2006, assessment from the Milwaukee Women's Center, Behavioral Health Services, revealed a diagnosis of depression and a GAF of 60.  (Tr. at 287-92.)  Plaintiff was apparently a no show for her next appointment on August 26 and was discharged on September 14, 2006.  (Tr. at 293-94.)

On December 13, 2006, William Nimmer, Ph.D., conducted a psychological evaluation. Plaintiff attended the appointment with Nanette Ray, an SSI advocate, who provided some background information and documents.  (Tr. at 298.)  Plaintiff reported spending a significant amount of time caring for her disabled mother, requiring her to give up free time, recreation, and socializing.  (Tr. at 299.)  Plaintiff also reported babysitting several nights per week for a grandchild, as the child's mother was somewhat dysfunctional, and caring for her own daughter after the girl was injured in a motor vehicle accident.  She felt her life was dedicated to care-giving for others, noting that she often felt overwhelmed.  (Tr. at 300.)

Plaintiff reported a history of treatment for depression, including medication and counseling.  She attributed her depression to difficulties in her relationship with a significant other, concerns over her mother's health, and the emergence of her care-taking role with little or no help from siblings.  She lived a very home-oriented and quiet life, with little socialization beyond work-oriented routines, and expressed a wish to be free of these responsibilities.  (Tr. at 300.)

In regards to daily activities, Dr. Nimmer noted that plaintiff seemed to have fair skills

---

[7]On October 26, 2006, William Merrick, Ph.D., reviewed and affirmed Dr. Bauer's assessment.  (Tr. at 295.)

in terms of domestic routines. She was able to meet her own requirements in terms of hygiene, simple cooking and shopping, and cleaning. She could operate a washer and dryer, and make purchases in stores, but she did need help with making change and reading the mail. She knew how to obtain a money order, but her ability to calculate was poor, leaving her vulnerable to exploitation in that regard. She had no driver's license but could take the bus. She reported spending her days watching TV, managing her mother's medical needs, and cleaning. She reported no outside activities other than church. (Tr. at 301.)

On mental status exam, Dr. Nimmer found plaintiff pleasant, reasonably groomed and garbed. She maintained eye contact and was willing and cooperative, with no indications of malingering or exaggeration. She tolerated the process well, with no signs of bizarreness or psychosis. (Tr. at 301.) She was socially appropriate throughout. (Tr. at 302.) Although she reported that her medication helped, plaintiff did evidence some vegetative signs of depression, including crying spells, occasional irritability, sleep disturbance, relative social withdrawal, and some somatic complaints. (Tr. at 302.) She was oriented to person, place, situation, and time, and memory function seemed reasonable for her age and IQ expectations. She could in a broad sense detail and sequence, but her ability to estimate time frames was somewhat poor. Abstract thinking ability was somewhat impoverished, and her general fund of information was low. She did evidence illiteracy, but her attention and concentration were fine throughout the session. (Tr. at 302.) Dr. Nimmer administered the WRAT-3 test, with plaintiff testing at the second grade level in reading, and the WAIS-III, on which she scored a full scale IQ of 66, verbal IQ of 63, and performance result of 77. (Tr. at 302.)

Dr. Nimmer concluded that the testing revealed cognitive limits with an intellectual level of mild mental retardation and adaptive skills that seemed "to bridge between deficient to

borderline." (Tr. at 303.) She had shallow problem solving skills and may react sharply to stressors, as she had difficulty processing contexts or making gainful plans. Primary limits involved her cognitive deficiency, ongoing depression elements, and the presently constraining circumstances of her life. She evidenced a fragility to stress and a shallowness of coping skills. He rated her prognosis as fair to poor. In regard to her work capacity, Dr. Nimmer opined that plaintiff could understand, remember, and carry out simple instructions only. She was not able to understand much in the way of multi-step and certainly not complex instructions. Her frustration tolerance was low, and her ability to deal with routine work stresses was fair to poor. (Tr. at 303.) Her capacity to maintain attention, concentration, and work pace on tasks at her level was reasonable, unless she experienced intrusions of headache pain. (Tr. at 303-04.) Her ability to adapt to changes fairly explained was fair, and her ability to respond to supervisors and co-workers was fair at best. Dr. Nimmer concluded: "She is felt to be at risk in terms of competitive employment regarding her issues with cognitive capacity and vulnerability to stressors." (Tr. at 304.) Under Axis I, Dr. Nimmer diagnosed learning disorder, NOS, depressive disorder, NOS, and dysthymic disorder; under Axis II, mild mental retardation; under Axis III, allergies and chronic pain associated with headaches; and a GAF of 45 to 55. (Tr. at 304.)

## B. Hearing Testimony

At the hearing before the ALJ, plaintiff testified that her date of birth was August 27, 1965, she was unmarried, and had three children, ages twenty-four, twenty-two, and nineteen, the youngest of whom lived with her. (Tr. at 39-40.) She also lived with and cared for her infirm mother. She had completed the tenth grade in school and had not obtained a GED or HSED. (Tr. at 40.) She stated that she could not read very well, but could write. Her daughter

12

helped her read the mail.  She did not have a driver's license and never did.  She testified that she had not worked for many years, last holding a packing job in 2000 or 2002.[8]  (Tr. at 41.) She testified that she stopped working to provide care for her mother, who was disabled due to seizures.  She stated that she still cared for her mother, but her daughter helped.  (Tr. at 42-43.)

Plaintiff testified that she took various prescription medications for back pain, depression, allergies, and headaches.  (Tr. at 44-47.)  She testified that her pills made her dizzy and drowsy.  (Tr. at 48.)  She stated that she recently started experiencing back and leg pain, which made it hard to walk.  She had received medications related to this problem just a few days before the hearing after having not seen a doctor for some time.  (Tr. at 49-51, 60-61; see also Tr. at 311.)

Plaintiff testified that on a typical day she tried to clean and do laundry but spent most of her time sitting down.  (Tr. at 51-52.)  She was able to care for her personal needs, but her daughter did most of the cooking.  (Tr. at 52.)  She watched TV and shopped with help.  (Tr. at 53.)

Plaintiff testified that she had received treatment for depression at the Milwaukee Women's Center but stopped going due to lack of transportation.  She stated that she worried because she had no help or support from her siblings.  (Tr. at 55.)  She also testified to trouble sleeping, feeling weak and tired, and a poor appetite.  (Tr. at 56.)  She indicated that she experienced crying spells.  She said that she did not have trouble getting along with others but did have problems with anger, which caused her to snap at people.  Her ability to do math was

---

[8]SSA records revealed no earnings since 1998.  (Tr. at 145.)

"not that good," and she could not tell whether she had received correct change at a store. (Tr. at 57-58.) When asked if she needed help with bills and finances, she said "Not really. My daughter go with me." (Tr. at 58.)

The ALJ summoned a VE, Robert Newman, who classified plaintiff's past work as a bottle packer as light and unskilled. He saw no other relevant work history. (Tr. at 63.) The ALJ then asked a hypothetical question, assuming a person of plaintiff's age and vocational/educational level; capable of medium work with no climbing, balancing, heights or hazards; occasional stooping, kneeling, crouching, and crawling; and mentally limited to routine, repetitive, simple, non-complex, low stress, one or two step jobs, with no public contact and occasional interaction with co-workers and supervisors. (Tr. at 64.) The VE testified that such a person could perform plaintiff's past work, as well as other jobs at the medium, light, and sedentary levels, such as hand packer, packing machine operator, stock clerk, laundry worker, production inspector, and surveillance monitor. (Tr. at 64-65.) However, if the person's ability to handle work stress was poor to fair, none of these jobs could be done. (Tr. at 66.)

## C.    ALJ's Decision

Following the five-step process, the ALJ found that plaintiff had not engaged in SGA since June 27, 2006, the date of her application, and that she suffered from the severe impairments of depression, learning disability, cognitive disorder, and headaches. (Tr. at 16.) At step three, the ALJ considered whether plaintiff met Listing 12.05C for mental retardation, noting that plaintiff's IQ scores fell in the mildly mentally retarded range. (Tr. at 16.) However, in order to meet that Listing plaintiff also had to satisfy the criteria in the Listing's introductory paragraph, including a showing of "deficits in adaptive functioning." (Tr. at 16-17.) On review of the entire record – and particularly the reports of consultative examiners Drs. Nimmer and

14

Nuttal – the ALJ found that plaintiff did not meet the criteria of mental retardation. While both examiners noted plaintiff's low IQ scores and reading levels, they also concluded that she had reasonably good adaptive skills. The ALJ noted that plaintiff acted as the primary care-giver for her infirm mother and as a temporary care-giver to her teenaged daughter after the girl was injured in an accident. (Tr. at 17.)

The ALJ acknowledged that Dr. Nimmer found, based on IQ scores and reading difficulties, that plaintiff was mildly mentally retarded. However, Dr. Nuttal noted that plaintiff was able to care for her daughter, mother, and herself; make meals, shop, and do laundry; and socialized well with neighbors and had a good relationship with her children. Dr. Nuttal thus concluded that, despite the low IQ scores, plaintiff's high degree of independent functioning meant that she was not mentally retarded. (Tr. at 17.) The ALJ agreed, finding that plaintiff had a high degree of adaptive functioning. The ALJ noted that plaintiff took care of an older person with disabilities and was basically independent, requiring only minimal help. The ALJ concluded that Dr. Nuttal's opinion was better supported by the record than Dr. Nimmer's and thus gave it significant weight, concluding that plaintiff did not meet Listing 12.05. (Tr. at 17.)

The ALJ also considered whether plaintiff satisfied Listing 12.04, affective disorders, but concluded that while plaintiff had been treated for depression (thus meeting the A criteria), she experienced no more than moderate limitations under the B criteria of the Listing.[9] (Tr. at 17-18.) Plaintiff's GAF scores generally hovered around 60, indicative of moderate symptoms, and her treating doctors noted no disabling depressive symptoms. The state agency consultants (Drs. Bauer and Merrick) found only moderate limitation of function, consistent with

_____

[9]The ALJ found that the evidence failed to establish the presence of the C criteria. (Tr. at 18.)

the treatment records and the reports of consultative examiners (Drs. Nimmer and Nuttal). (Tr. at 18.)

The ALJ then concluded that plaintiff retained the RFC to perform a full range of work at all exertional levels, but with the following non-exertional limitations: unskilled, simple, low stress, one to two step jobs only; no public contact; occasional interaction with co-workers; no climbing or balancing; and no working at heights or with hazards.[10] (Tr. at 18.) Plaintiff had no past relevant work, so the ALJ proceeded to step five, concluding, based on the VE's testimony, that jobs existed that plaintiff could perform despite her limitations. (Tr. at 19-20.) The ALJ accordingly found plaintiff not disabled and denied her application. (Tr. at 20-21.)

## III. DISCUSSION

In her request for judicial review, plaintiff alleges a single error – that the ALJ improperly found that she did not satisfy the mental retardation Listing, 12.05C.[11] In order to satisfy that Listing plaintiff must demonstrate (1) significantly sub-average general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; (2) a valid verbal, performance, or full scale IQ of 60 through 70; and (3) a physical or other mental impairment imposing an additional and significant work-related limitation of function. See Witt v. Barnhart, 446 F. Supp. 2d 886, 894 (N. D. Ill. 2006). There is no dispute that – based on her IQ scores and other impairments – plaintiff satisfies the second and third elements (set forth in section C of the Listing). The dispute is whether she satisfies the first element (set forth in

_____

[10]The ALJ imposed the final two limitations based on plaintiff's headaches. (Tr. at 19.)

[11]Plaintiff has therefore waived any other allegations of error. See Schoenfeld v. Apfel, 237 F.3d 788, 793 (7th Cir. 2001) (citing Ehrhart v. Sec'y of Health and Human Serv., 969 F.2d 534, 537 n.4 (7th Cir. 1992)).

the Listing's introductory paragraph or "capsule") – "deficits in adaptive functioning." As noted above, the ALJ, crediting Dr. Nuttal's report, concluded that plaintiff did not experience such deficits. Plaintiff argues (A) that the ALJ used the wrong legal standard in considering adaptive functioning, and (B) that the ALJ's conclusion on this issue lacks the support of substantial evidence in the record.

## A.    Legal Definition of "Deficits in Adaptive Functioning"

Listing 12.05 does not define the term "deficits in adaptive functioning." Consequently, plaintiff notes, some courts have relied on the American Psychiatric Association's <u>Diagnostic and Statistical Manual of Mental Disorders</u> (DSM-IV), which states that: "*Adaptive functioning refers to how effectively individuals cope with common life demands and how well they meet the standards of personal independence expected of someone in their particular age group, sociocultural background, and community setting.*" DSM-IV at 42. Under the DSM-IV, a diagnosis of mental retardation requires "significant limitations in adaptive functioning in at least two of the following skill areas: communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health, and safety." DSM-IV at 41. Plaintiff notes that the ALJ did not evaluate adaptive functioning using these skills areas in the present case, instead relying primarily on plaintiff's care-taking responsibilities. The ALJ also relied on Dr. Nuttal's report, but Dr. Nuttal likewise focused primarily on daily activities rather than the broader set of skills set forth in the DSM-IV. By failing to analyze all of the DSM-IV skill areas, plaintiff contends, the ALJ used an improper definition of deficits in adaptive functioning and thus committed legal error.

However, the SSA has not adopted the DSM-IV factors for purposes of Listing 12.05.

Indeed, the SSA specifically declined a commenter's suggestion that it do so during a rule-

making period. The agency stated:

> We did not adopt the comment. The definition of MR we use in our listings is consistent with, if not identical to, the definitions of MR used by the leading professional organizations. The four major professional organizations in the United States that deal with MR have each established their own definition of MR. While all the definitions require significant deficits in intellectual functioning, as evidenced by IQ scores of approximately 70 or below, age of onset and the method of measuring the required deficits in adaptive functioning differ among the organizations.
>
> For example, the definition of MR used in the DSM-IV is predominantly based on (but not identical to) the revised definition of MR promulgated by the American Association on Mental Retardation (AAMR) in 1993. The DSM-IV states: "The essential feature of mental retardation is significantly subaverage general intellectual functioning (further defined as an IQ standard score of approximately 70 or below), that is accompanied by significant limitations in at least two of the following skill areas: communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health, and safety. The onset must occur before age 18 years."
>
> Following publication of this new definition of MR by the AAMR, the American Psychological Association published its own "Manual of Diagnosis and Professional Practice in Mental Retardation, 1996." It states: "Mental retardation refers to (a) significant limitations in general intellectual functioning; (b) significant limitations in adaptive functioning, which exist concurrently; and (c) onset of intellectual and adaptive limitations before the age of 22 years." In its definition, (a) is defined as "* * * an IQ or comparable normed score that is two or more standard deviations below the population mean for the measure;" and for (b), "* * * the criterion of significance is a summary index score that is two or more standard deviations below the mean * * *."
>
> The definition of MR used by SSA in the listings is not restricted to diagnostic uses alone, nor does it seek to endorse the methodology of one professional organization over another. While capturing the essence of the definitions used by the professional organizations, it also is used to determine eligibility for disability benefits. SSA's definition establishes the necessary elements, while allowing use of any of the measurement methods recognized and endorsed by the professional organizations.

Technical Revisions to Medical Criteria for Determinations of Disability, 67 FR 20018-01, 2002

WL 661740, at *20022 (Apr. 24, 2002); see also Maresh v. Barnhart, 438 F.3d 897, 899 (8th

Cir. 2006) ("In revising the Listings of Impairments in 2002, the Commissioner rejected a proposal that the DSM's definition be used for Listing 12.05."); King v. Barnhart, No. 1:06-cv-0381, 2007 WL 968746, at *5 (S.D. Ind. Feb. 26, 2007) (noting that "the Social Security Administration considered and rejected the use of the DSM-IV definition of mental retardation," instead relying "on the more flexible standard found in the current language of Listing 12.05, which incorporated the essential elements of the four most widely used definitions of mental retardation").

Plaintiff cites cases in which courts found the DSM-IV "helpful" in considering Listing 12.05 claims, e.g., Durden v. Astrue, 586 F. Supp. 2d 828, 836 (S.D. Tex. 2008); see also Witt, 446 F. Supp. 2d at 895, but she provides no authority for the proposition that non-compliance with the DSM-IV (or any other particular measurement method) necessarily constitutes step three legal error. See Blancas v. Astrue, 690 F. Supp. 2d 464 (W.D. Tex. 2010) (surveying the case-law and finding that, other than in an unpublished Tenth Circuit case, the courts of appeals had adopted no clear standard for measuring deficits in adaptive functioning). Like several other appellate courts, the Seventh Circuit has at times cited the DSM-IV in addressing deficits in adaptive functioning, but it has adopted no rigid test the ALJ must apply, see, e.g., Novy, 497 F.3d at 710 (citing the DSM-IV but stating that the test is simply whether the claimant can "cope with the challenges of ordinary everyday life"); see also Adkins v. Astrue, 226 Fed. Appx. 600, 605 (7th Cir. 2007) (stating that the ALJ should, in addition to IQ scores, consider other factors such as the claimant's life activities and employment history). Courts within this circuit have also affirmed denials made in reliance on psychological reports, even when those reports did not appear to track the DSM-IV. See, e.g., Maggard, 167 F.3d at 380 (affirming ALJ's finding that low IQ scores were not valid based in part on a report from a psychological

consultant discussing the claimant's mental ability for work); <u>Parker v. Astrue</u>, No. 1:08-cv-0966, 2009 WL 2177951, at *7 (S.D. Ind. July 22, 2009) (affirming ALJ's decision relying on a psychiatric evaluation that found no deficits in adaptive functioning).  Therefore, I cannot conclude that the ALJ committed an error of law in the present case.

**B.    The ALJ's Factual Finding Regard Plaintiff's Adaptive Functioning**

Plaintiff also argues that the ALJ's step three factual determination lacks the support of substantial evidence.  Specifically, she contends that Dr. Nimmer conducted a broader and more thorough evaluation than Dr. Nuttal, one that better tracks the DSM-IV criteria.  She argues that the ALJ thus erred in adopting Dr. Nuttal's opinion over Dr. Nimmer's.

However, it is not the role of the reviewing court to make such determinations.  Where, as here, the record contains conflicting medical reports, it up to the ALJ to decide which doctor to believe.  <u>Books v. Chater</u>, 91 F.3d 972, 979 (7th Cir. 1996); <u>see also</u> <u>Young v. Barnhart</u>, 362 F.3d 995, 1001 (7th Cir. 2004) ("Weighing conflicting evidence from medical experts . . . is exactly what the ALJ is required to do."); <u>Brooks v. Astrue</u>, No. 1:08-CV-00019, 2008 WL 5392027, at *8 (N.D. Ind. Dec. 23, 2008) ("Here, the ALJ properly considered and resolved the conflicting opinions of Dr. Bundza, who opined that Brooks was mildly mentally retarded, and Dr. Klion, who concluded that Brooks had borderline intelligence.  We will not accept Brooks's invitation to merely reweigh the evidence at this juncture.").

Plaintiff accuses the ALJ of ignoring the evidence Dr. Nimmer considered regarding her deficits in the other DSM-IV skill areas of adaptive functioning, instead focusing on activities of daily living.  However, the ALJ need not exhaustively discuss every piece of evidence in the record and is prohibited only from ignoring an entire line of evidence that supports a finding of disability.  <u>Jones</u>, 623 F.3d at 1162.  Here, the ALJ discussed Dr. Nimmer's report, and while

20

her opinion may not have precisely tracked the DSM-IV, she did consider the entire record in evaluating plaintiff's adaptive functioning.[12]

First, the ALJ noted that plaintiff acted as the primary care-giver for her mother, who suffered from a seizure disorder and cognitive problems; she also acted as a temporary care-giver when her teenaged daughter was injured in an accident and frequently babysat for a grandchild. (Tr. at 17.) The ALJ could reasonably conclude that plaintiff's ability to adapt to handle these significant responsibilities lent support to Dr. Nuttal's conclusion.

Second, while acknowledging that plaintiff required help with reading and making change, the ALJ noted that plaintiff was able to tend to her basic needs and engaged in a broad range of other activities, including cooking, shopping, taking the bus, and doing laundry. The ALJ could likewise reasonably find that plaintiff's ability to engage in these tasks – largely independently – supported Dr. Nuttal's conclusion.[13] (Tr. at 17.)

Third, the ALJ noted that while plaintiff was estranged from some of her siblings, she did socialize with neighbors and maintained a good relationship with her own children. (Tr. at 17-18.) While Dr. Nimmer noted some social isolation, this appeared to be related more to plaintiff's significant care-taking responsibilities than to her own limitations. Fourth, the ALJ

---

[12]Further, Dr. Nuttal's report, which the ALJ credited, generally covered the DSM's skill areas. Dr. Nuttal found that plaintiff communicated well (Tr. 240), had little or no trouble with self-care and home management (Tr. at 240, 242), socialized with neighbors and family (Tr. at 241, 242), and used public transportation and received mental health treatment in the community (Tr. at 240, 242). Dr. Nuttal further noted that plaintiff had no trouble tolerating the length and pace of the interview (Tr. at 241) and, while she required structure and encouragement, she was able to complete testing (Tr. at 242). Plaintiff reported doing very well on a W-2 job assignment. (Tr. at 241.) Dr. Nuttal also considered plaintiff's academic skills (Tr. at 242) and her leisure activities (Tr. at 242).

[13]The ALJ also noted Dr. Nimmer's conclusion that plaintiff was competent to manage her own funds. (Tr. at 17.)

noted Dr. Nimmer's finding that plaintiff retained a "reasonable" ability to maintain concentration, persistence, and pace. (Tr. at 17.) Fifth, the ALJ credited the reports of the state agency consultants, Drs. Bauer and Merrick, who also found that plaintiff did not meet Listing 12.05C. (Tr. at 18.) Ultimately, the ALJ concluded that plaintiff had a high degree of adaptive functioning and was basically independent, requiring only minimal help. (Tr. at 17.) Substantial evidence supports that determination.[14]

In Novy, the Seventh Circuit affirmed the ALJ's denial of a Listing 12.05C claim, stating:

The key term in the introductory paragraph of section 12.05 of the regulation, so far as bears on this case, is "deficits in adaptive functioning." The term denotes inability to cope with the challenges of ordinary everyday life. American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders, Text Revision (DSMIV-TR) 42 (4th ed. 2000). If you cannot cope with those challenges, you are not going to be able to hold down a full-time job. In the case of Novy, however, the administrative law judge was on firm ground in finding that she can cope. She lives on her own, taking care of three children (possibly four – she definitely has four but the record is unclear whether more than three of them are living with her) without help, feeding herself and them, taking care of them sufficiently well that they have not been adjudged neglected and removed from her custody by the child-welfare authorities, paying her bills, avoiding eviction. Her intellectual limitations pose serious challenges to her ability to raise a family on her own. But she has overcome those challenges well enough that she should be able to hold down a full-time job – or so at least the administrative law judge was entitled to conclude without courting reversal.

497 F.3d at 710. The same is true in the present case. Plaintiff lives on her own, cares for herself and others, and manages household affairs within minimal assistance. The ALJ was

_____

[14]Although Dr. Nimmer diagnosed plaintiff as mentally retarded, as the ALJ noted, the body of his report does suggest that plaintiff maintained "reasonably good adaptive skills." (Tr. at 17.) Specifically, Dr. Nimmer found plaintiff open, expressive, willing and cooperative (Tr. at 301), with "fair skills in terms of domestic routines" (Tr. at 301) and reasonable memory for age and IQ expectations (Tr. at 302). Her attention and concentration throughout the interview were fine, although she did require occasional redirection. (Tr. at 302.) Dr. Nimmer concluded that plaintiff's "adaptive skills seem to bride between deficient to borderline" (Tr. at 303), suggesting that he viewed the issue as a close one.

22

accordingly permitted to find that plaintiff can work. <u>See also</u> <u>Cooper v. Massanari</u>, No. 00 C 8083, 2001 WL 1464930, at *8-9 (N.D. Ill. Nov.15, 2001) (affirming the ALJ's finding that the claimant did not satisfy the adaptive deficits requirement of Listing 12.05C where, despite her limited education and illiteracy, she had worked in the past and independently managed most activities of daily living).

## IV.  CONCLUSION

**THEREFORE, IT IS ORDERED** that the ALJ's decision is **AFFIRMED**, and this action is **DISMISSED**.  The Clerk is directed to enter judgment accordingly.

Dated at Milwaukee, Wisconsin this 25th day of January, 2011.

/s Lynn Adelman

_____
LYNN ADELMAN
District Judge